UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

MELISSA IBBISON,                    )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Case No. 3:12-cv-00545-GWC
                                    )
USI INSURANCE SERVICES OF           )
CONNECTICUT, INC., and USI          )
INSURANCE SERVICES LLC,             )
                                    )
        Defendants.                 )

**OPINION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 55)

Plaintiff Melissa Ibbison brings this action against Defendants USI Insurance Services of Connecticut, Inc. and USI Insurance Services LLC (collectively, "USI"),[1] alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §§ 46a-60 et seq. (*See* Doc. 1.) USI seeks summary judgment with respect to all claims against it, arguing that Ibbison cannot establish: (1) discrimination based on a hostile work environment; (2) discrimination under the *McDonnell-Douglas* burden-shifting framework; or (3) that her termination was in retaliation for reporting unlawful discrimination or harassment. (Doc. 55.) The court heard argument on USI's Motion on February 18, 2016. For the reasons discussed below, USI's Motion for Summary Judgment (Doc. 55) is GRANTED.

## Background

The following facts are undisputed except where noted.

### I.    USI Hires Ibbison

On or about May 17, 2010, USI Insurance Services of Connecticut, Inc. hired Plaintiff Melissa Ibbison as an insurance "producer." Her job title was Assistant Vice President, Employee Benefits, and she was based out of USI's Meriden, Connecticut office. "Producers"

---

[1] Defendant USI Insurance Services LLC is a successor by merger to USI Insurance Services of Connecticut, Inc.

are responsible for developing new contacts in USI's target market and selling insurance benefits packages to clients.

Ibbison reported directly to Frank Pulito, President of USI's Employee Benefits Group in Connecticut. During her first year of employment, Ibbison was to earn a base salary of $75,000 and a "new business bonus" depending on net commissions and fees attributable to Ibbison's work. (Doc. 55-4 at 5.) Ibbison's Employment Agreement with USI, dated May 17, 2010, stated that her employment could be terminated at any time "with or without cause." (*Id.* at 9.)

Defendant USI Insurance Services LLC is a successor by merger to USI Insurance Services of Connecticut, Inc. USI has several regional offices throughout the United States, including an office in Meriden, Connecticut. The Employee Benefits Group at USI sells health insurance plans to clients, as well as other related group insurance plans, such as life and liability insurance.

## II.     USI's Policies Against Harassment and Discrimination

USI maintains a "Non Harassment Policy" that prohibits all forms of harassment on the basis of a protected characteristic and otherwise, and specifically prohibits unwelcome sexual advances. (Doc. 55-4 at 27.) USI distributes this policy to employees via an Employee Handbook. The policy states, among other things:

> USI's policy also prohibits harassment on the basis of an individual's race, color, religion, sex, national origin, age, marital status, citizenship status, disability, sexual orientation, genetic predisposition or carrier status, military or veteran status or any other protected classification.

> Specifically, USI prohibits:

> 1.  unwelcome sexual advances;
> 2.  requests for sexual favors;
> 3.  offensive comments, jokes, innuendoes, gestures, or other sexually oriented or offensive conduct; and
> 4.  all other verbal or physical conduct of a sexual or otherwise offensive nature where
>     a.  submission to such conduct is made either explicitly or implicitly a term or condition of employment;
>     b.  submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; and
>     c.  such conduct has the purpose or effect of unreasonably creating an intimidating, hostile or offensive working environment.

(*Id.*)  The policy also contains a "Complaint Procedure," which states in pertinent part as follows:

> It is the responsibility of each USI employee and all members of USI's management to create an atmosphere free of harassment, sexual or otherwise.  In addition, it is the responsibility of each employee to respect the rights of his or her coworkers.  **It is the responsibility of USI's employees who experience any job-related harassment to use the complaint procedure established for the purposes of preventing and correcting unacceptable workplace behavior.**  If an employee experiences or observes any job-related harassment, or has a related complaint, or believes he or she has been treated in an unlawfully discriminatory manner, he or she must promptly report the matter to any of the individuals listed below:
>
> - supervisor
> - unit leader, manager
> - HR department
> - the Operating Company President
> - the Chief Executive Officer.
>
> You may also contact the confidential USI Compliance Hotline . . . .
>
> Upon receipt of any such complaints, the individual with whom the complaint is filed shall, in conjunction with the appropriate member of the human resources department, undertake a prompt and thorough investigation of the allegations.  Confidentiality will be maintained to the maximum extent possible and information shall be provided to others on a need-to-know basis only.  Should the investigation determine that an individual has engaged in harassing behavior or otherwise discriminated against an employee, disciplinary action, up to and including employment termination, may be considered against the offending employee.
>
> **USI expressly prohibits any form of retaliatory action against any employee availing him/herself of the benefits of this procedure.** . . .

(*Id.* at 28–29.)  During her employment with USI, Ibbison received a copy of the Employee Handbook and was familiar with both the "Non Harassment Policy" and the "Complaint Procedure."

USI also maintains a "Policy Prohibiting Discrimination and Harassment," which, like the Non-Harassment Policy and Complaint Procedure, broadly prohibits all types of discrimination and harassment, and states:

> This policy prohibits discrimination and harassment in violation of this policy in any form, including verbal, physical and visual discrimination or harassment, and

3

> also prohibits retaliation against any person who reports or threatens to report
> discrimination or harassment with a good faith belief that such discrimination or
> harassment has occurred, or who truthfully cooperates in an investigation of
> alleged discrimination or harassment.

(*Id.* at 31.) The policy provides employees with a list of individuals within the company to whom they can report any discrimination or harassment, and it informs employees that they can report harassment and discrimination anonymously via a toll-free confidential Compliance Hotline. During her employment with USI, Ibbison was familiar with this policy and signed in receipt of it on May 17, 2010.

### III.   USI's Performance Metrics and Ibbison's Business Plan

To assess a producer's performance, USI tracks the amount of sales a producer makes and how much revenue is generated by those sales. USI also gauges a producer's performance by tracking the number of a producer's "first appointments," "follow-up appointments," and "finalist presentations." A finalist presentation is essentially the final step in the process prior to the client purchasing benefits programs from USI. USI further monitors a producer's "pipeline," i.e., the opportunities that look like they are going to close.

Ibbison's business plan for 2010 set a goal of $100,000 of new business for her first year of employment, although she understood that bringing in $75,000 was sufficient to cover her salary during the first year. The plan also indicated that, in or around May 2010, Ibbison was expected to target clients and potential clients in Connecticut with more than 50 employees. According to Pulito, USI's "main focus" for new producers like Ibbison was on clients with more than 100 employees. (Doc. 55-4 at 22.) Ibbison asserts that, when she began her employment with USI, the company sought to sell plans to clients whose accounts could generate $5,000 in revenue (which did not rule out clients with fewer than 100 employees). (*See* Doc. 55-3 at 42.) According to Ibbison, USI modified its target market in October 2010 to target accounts capable of generating $10,000 in revenue. (*Id.*) But according to Pulito, USI producers who targeted employers capable of generating $10,000 in revenue would not be in the "100-plus" market that USI was pursuing. (Doc. 55-4 at 22.) Pulito maintains that the $10,000 figure was designed to ensure that if producers "had business like that already, they weren't gonna lose it." (*Id.*)

Because Ibbison had no prior experience in the industry, USI assigned senior producer Kim Quigly to mentor Ibbison and help her develop a business plan and client relationships.

Ibbison also had one-on-one weekly meetings with Pulito, her supervisor, to discuss her list of potential clients and her pipeline. As a new producer, Ibbison was also required to participate in role-playing and other training seminars to develop her skills, and Ibbison participated in some of these opportunities.

## IV.    Derek Dailey and Ibbison's Relationship with Him in June and July 2010

Derek Dailey began working at USI's Roseland, New Jersey office as a producer in the Employee Benefits group in or around April 2010. Dailey had no involvement in hiring Ibbison, no involvement in setting the terms of her employment, no involvement in setting her salary, and no authority to terminate her employment. Ibbison testified that Dailey had no responsibility for supervising her work and no responsibility for directing her work assignments. (Doc. 63-1 at 129–30.) However, also according to Ibbison, Dailey was a Vice President (not an Assistant Vice President) because he had prior employee benefits experience. (*Id.* at 38.)

Ibbison first met Dailey during a weeklong USI training seminar that took place between about May 24 and May 28, 2010. During the training, Dailey initially spoke with Ibbison about business contacts he had in Connecticut, including some jewelry store and municipality contacts. A day or two into the training, the conversations between Ibbison and Dailey became less about business, and more personal, and Dailey began to make sexual advances towards Ibbison. He told her that he liked her legs and breasts, and that he was well endowed. Ibbison told Dailey that she was not interested in him. One night after a group dinner, Dailey walked Ibbison back to her hotel and tried to kiss her, but she pushed him away. At the time of the training seminar, Ibbison did not report any of Dailey's conduct to the USI leaders running the seminar, nor did she report any such conduct to her supervisor, Human Resources, the President or CEO of USI, or via the Compliance Hotline.

At the training seminar, Ibbison gave Dailey her personal email address. On Saturday, May 29, 2010, Dailey emailed Ibbison from his personal account the first of a series of fervent and highly affectionate statements of enduring love.[2] (*See* Doc. 55-5 at 25.) In June 2010, Ibbison began working with Dailey to pursue his jewelry store contacts in Connecticut. During their drives to potential clients, Dailey continued to make advances toward Ibbison, complimenting her body and touching her leg. When Ibbison told Dailey to stop touching her leg, he did. One day in or around June 2010, Dailey parked his car at Ibbison's apartment so that

---

[2] It is unnecessary to recite the undisputed contents of Dailey's emails here.

they could drive to a prospective client together.  After visiting with the client, they attended a networking event.  When the event ended, they drove back to Ibbison's apartment, and Dailey asked to use the restroom.  Ibbison agreed to let Dailey use the restroom and, once inside, Dailey kissed Ibbison, who initially kissed him back, but then pushed him away.  Dailey left shortly thereafter.

On June 20, 2010, Dailey sent another email to Ibbison's personal email account declaring his love for her.  (*See* Doc. 55-5 at 27.)  On June 27, Dailey sent Ibbison a list of places in New Jersey (his home state) where she could potentially live.  The list identified desirable neighborhoods and Dailey's assessment of the local school systems.  (*Id.* at 29.)

Throughout July 2010, Ibbison and Dailey exchanged regular telephone calls on their personal cell phones, some after business hours.  For example, on July 4, 2010 (a national holiday), Ibbison called Dailey at 7:35 p.m. and the call lasted for 49 minutes.  According to Ibbison, a lot of the calls had to do with business.  (Doc. 63-1 at 124.)  Also on July 4, Dailey emailed Ibbison saying, "M Love, . . . I'm wondering if we can't come up with and grow something ourselves, maybe outside of the insurance world . . . ."  (Doc. 55-7 at 2.)  Later that same day, Dailey emailed Ibbison again with a spreadsheet detailing his personal property expenses because he wanted Ibbison to move in with him.  (*See id.* at 4.)

On July 19, 2010 (55 days after the second day of the training seminar at which they met), Dailey emailed Ibbison with the subject line "55 Days," again declaring his love.  (*See id.* at 6–7.)  That same day, Dailey emailed Ibbison a video of his young son saying good night to her.

At some point during her employment with USI, Dailey gave Ibbison a statue of a man embracing a nude female and told her a Greek story that went along with it.  He gave her the statue at the office.  (Doc. 63-1 at 112.)  Ibbison thought it was inappropriate for the workplace, and she put the statue in her desk drawer.  After Ibbison left USI, a coworker informed her that she had left the statue behind and gave it back to her.

## V.     Ibbison's Work Performance in June and July 2010

On July 16, 2010, Pulito emailed Ibbison and two of her coworkers, Sal Cianfaglione and Anne Lavoie.  The subject line of Pulito's email stated: "4 New Appointmen[ts] Per Month, 1 Final presentation Per Month."  (Doc. 55-7 at 11.)  The body of the email stated:

6

The subject line is the road to success.  Because all of you started in May, we will start with June as the first complete month.  From June on, the appointments are as follows:

Sal with 8, Anne with 4 and Melissa with 2.  Great pace, Sal.  At minimum, you need to meet these thresholds and each need to be in our target market.  Please feel free to reach out to any team member who you think can help.

(*Id.*)  Ibbison maintains that she had more appointments than the two that are indicated in Pulito's email. (Doc. 63-1 at 70.)  Ibbison also asserts that she and Cinafaglione were not similarly situated, since Cianfaglione had prior experience in the industry, had a pre-existing book of business, and had a higher starting salary than Ibbison based on his experience and capabilities.  (*See* Doc. 63-1 at 74; *see also* Doc. 63-2 at 29.)[3]

## VI.    Ibbison Speaks with Pulito About Dailey Around July or Early August

In or around July or early August, Ibbison met with Pulito in a one-on-one meeting.  At that meeting, Pulito remarked that Dailey had been coming to the Connecticut office for "non-business related meetings." (Doc. 63-1 at 51.)  Ibbison told Pulito that she agreed with him. (*Id.*)  She says that she understood Pulito to mean that he saw that Dailey had "romantic sexual . . . or other intentions" toward her.  (*Id.*)  Ibbison then informed Pulito that Dailey was making her "uncomfortable" and "harassing" her, and that she no longer wanted to work with Dailey.  (*Id.* at 50.)

At no point during her conversation with Pulito did Ibbison tell him that Dailey had tried to touch or kiss her.  At no point did she inform Pulito of the emails Dailey sent her or any specific comments Dailey made.  Pulito told Ibbison that she no longer had to work with Dailey.  After her conversation with Pulito, Ibbison never went with Dailey to any client meetings or otherwise had to work with him in person again.  Ibbison was satisfied with Pulito's response; at that point she "felt the situation had . . . been taken care of." (Doc. 63-1 at 57.)

## VII.   Ibbison's Relationship with Dailey During and After August 2010

After Ibbison spoke with Pulito about Dailey, she stayed in contact with Dailey and continued to email Dailey (even though she no longer had to work with him in person).

---

[3] Pulito clarified that, because of a noncompete agreement, Cianfaglione could not take his prior book of business with him to USI, but that USI did take "into account" the likelihood that, after the noncompete expired, Cianfaglione might be able to get his book back.  (Doc. 63-2 at 29.)

According to Ibbison, Dailey did "make sure he stopped by" to see her every time he came to the Connecticut office for business-related reasons. (Doc. 63-1 at 55.) On August 10, 2010, Ibbison emailed Dailey concerning his jewelry store contacts. She ended the email chain by saying, "Please keep in touch then, and hope to talk soon . . ." (Doc. 55-7 at 13 (ellipsis in original).) On August 16, 2010, Dailey sent Ibbison an email from his personal email account to her personal email account with a picture attachment of his torn pants. (Doc. 55-7 at 18.)[4] On August 25, 2010, Ibbison emailed Dailey, sending him information he had asked for concerning certain international capabilities. On September 11, 2010, Dailey emailed Ibbison chapters of a book he was writing. Ibbison responded the next day saying, "This is good—send me some more if you can . . ." (Doc. 55-7 at 23 (ellipsis in original).)

According to Ibbison, in October Dailey came to her house drunk and banged on her door. (Doc. 63-1 at 41–42.) He was upset with her for not attending a business trip with him. (*Id.* at 47.) Throughout October and November, Dailey and Ibbison continued to exchange work-related emails concerning opportunities in the industry. Ibbison states that she continued exchanging emails with Dailey for the following reasons:

> He would send me e-mails. Considering I still worked with him. We had to be in conference calls together, because we were part of the class[] [of] new hires. I felt it was in my best interest, considering what he did, to be [in] amicable relations with him. I didn't want to do anything that might upset him to do anything. He also held positions of—he also knew people in positions of authority over me in my company considering he was talking to CEOs about his business plan, things like that. I felt it would probably be in my best interest to not do anything that might anger or upset him. So I figured a couple e-mails, friendly e-mails back and forth about business. I figured that would be the least I could do.

(Doc. 63-1 at 54.) Ibbison never informed Dailey that she told Pulito that she no longer wanted to work with Dailey.

## VIII.  Ibbison's Job Performance During and After August 2010

By August 2010, Ibbison had not made any sales. An attachment to an email from Pulito dated August 16, 2010 did not show Ibbison as having any business in her pipeline. (*See* Doc. 55-4 at 35.) Ibbison asserts that, as of August 2010, she had three business opportunities in her

---

[4] The quality of the image in the record is poor. Ibbison testified that the pants were ripped in the back. (Doc. 63-1 at 112.)

pipeline.[5]  It is undisputed that Cianfaglione, by contrast, had approximately $200,000 of business in his pipeline that was expected to close in September and October.  For the reasons stated above, however, Ibbison asserts that she and Cinafaglione were not similarly situated.

An attachment to an email from Pulito dated August 14, 2010 shows Ibbison as being ranked third to last out of all the producers that had started at USI nationally in 2010, and behind both Lavoie and Cianfaglione in the Connecticut office.  (*See* Doc. 55-5 at 3.)[6]  The same attachment shows that, approximately four months into her job, Ibbison had eight first appointments, five follow-up appointments, and no finalist presentations.  (*See id.*)  The "Producer Ranking" document upon which Ibbison relies shows that, through October 2010, she had 14 first appointments, two follow-up appointments, and one finalist presentation.  (Doc. 63-3 at 53.)  The same document, for the same time period, shows: Cianfaglione with 10 first appointments, two follow-up appointments, and two finalist presentations, and Lavoie with 15 first appointments, nine follow-up appointments, and zero finalist appointments.  (*Id.*)

In October, Pulito emailed Ibbison (copying Ibbison's mentor, Quigley) to let her know that he was "getting concerned about [her] low number of appointments and final presentations." (Doc. 55-8 at 7.)  Pulito recommended that Ibbison work with Quigley and himself "to develop a plan to increase [her] appointments."  (*Id.*)  Ibbison responded:

> I know I need to work on more qualified suspects, that take maybe more time or different means to develop. . . . I see where you are coming from and I am very open to any ideas or suggestions and I will meet with both of you when there is a convenient time to strategize.  The cold calling is not as effective as some other means may be.

(*Id.* at 10.)

------

[5] In support, Ibbison cites an unsigned, undated document she calls the "Producer Ranking."  (*See* Doc. 63-3 at 53.)  That document is a spreadsheet appearing to show year-to-date figures through October 2010, and that Ibbison had two first appointments and one follow-up appointment in August 2010.  It is unclear when in August any of those appointments occurred.

[6] The attachment is difficult to read, but it does appear to be formatted similarly to the "Producer Ranking" spreadsheet relied upon by Ibbison, and does show Ibbison as third from the bottom in a list of 25 producers.  The document includes year-to-date figures through September 2010.  It is unclear what method was used to sort the producers such that Ibbison was third from the bottom.

In an email dated November 18, 2010 and addressed to Quigley and USI's Benefits Producers and Service staff, Pulito thanked Quigley and Ibbison for taking initiative to come up with a solution to clients' confusion about open enrollment notice requirements, and for sharing that solution with other USI employees. (Doc. 63-3 at 97.) Pulito described Quigley and Ibbison's efforts as "a great sign of a healthy, engaged and successful organization" and as demonstrating "great character and maturity." (*Id.*)

By December 2010, Ibbison had made 23 first appointments, seven follow-up appointments, and three finalist presentation appointments. (Doc. 55-5 at 5.) She closed one sale valued at $10,000 in or around December 2010. That sale was to a client with only 16 employees. At the time of her termination in December 2010, Ibbison had also made a finalist presentation to another client. (Doc. 63-1 at 72.)

## IX.    Dailey's Pitch to Develop Business in Connecticut

Prior to December 13, 2010, Dailey contacted Pulito regarding starting a health insurance fund for municipalities with Dailey's municipality contacts in Connecticut. (*See* Doc. 63-2 at 30.) Pulito referred Dailey to John Klecha, President of USI's Connecticut office, and to USI producer Allen Jackson. (*Id.*) After Pulito referred Dailey to Klecha and Jackson, he did not ask either of them what became of Dailey's proposed plan. (*Id.*)

On or around December 13, 2010, Dailey came to the Connecticut office to pitch the idea. Ibbison was not involved in Dailey's proposal and did not attend the meeting between Dailey and Klecha. Klecha thought the plan was "fanciful" and lacking substance. (Doc. 55-8 at 16–17.) According to Klecha, "[t]here were a couple of efforts with the municipalities" but "[n]othing came out of it." (*Id.* at 18.) However, Jackson thought the plan was interesting or intriguing, and wanted to test it out. (*Id.* at 16; *see also* Doc. 63-3 at 56.) Dailey and Jackson made presentations to a group of towns. (Doc. 63-3 at 58.) They were unable to close the deal because not all the towns in the group were willing to release the data necessary to generate a firm quote. (*Id.* at 60.) Still, the plan did result in USI getting "one of [its] groups back" in January 2011. (*Id.* at 83.)

## X.    USI Terminates Ibbison's Employment in December 2010

Prior to December 15, 2010, Pulito and Klecha discussed terminating Ibbison's employment. (Doc. 63-3 at 39.) In an email dated December 14, 2010 and addressed to Klecha and to Tonyia Wright of USI's Human Resources Department, Pulito wrote:

In regards to Melissa, the decision centers around her pipeline and inability to develop qualified leads for our target market segment of 100–2000 employees. Sal Cianfaglione has been successful in closing two accounts in that segment with combined revenue just over $200,000.   Anne Lavoie currently has three opportunities in the 3 or 4 stage (conceptual/decision stage) for groups in this segment.  In addition, the majority of both Sal's and Anne's efforts and activities have been in the 100 plus segment.  Where as, Melissa's majority activity has been in the below 50 market segment.  In fact, she sold a group that had only 16 employees and $8,900 in revenue.

Bottom line, Melissa is ineffective in the large market segment.  In hiring her, our goal was to have her develop new appointments in this segment.  During her first six months, this has not occurred.

(Doc. 55-8 at 13.) Pulito has testified that he sent the email to "document[] the reasons as to why Melissa had been terminated." (Doc. 63-2 at 31.)

Pulito and Wright met with Ibbison and informed her that USI was terminating her employment.  A termination letter addressed to Ibbison and dated December 15, 2010 advised her that she was not required to work beyond December 15, 2010 and her employment was terminated effective December 31, 2010.  (Doc. 55-4 at 17.)

USI used "performance improvement plans" (PIPs) to give producers "the opportunity to kind of step up their game, and know that they're on a short leash relative to producing." (Doc. 63-2 at 22.)  Prior to her termination, Ibbison was never asked to sign a PIP.  (Id. at 23.)  Pulito testified that he did not ask Ibbison to sign a PIP because he "didn't see that she had the ability to achieve what we wanted to get done" and that he "would rather just be direct and end it versus make somebody go through something just for going through the motions." (Id.)  Pulito could not recall any other circumstance since he started with USI that a producer was terminated without being asked to sign a PIP.  (Id.)  Lavoie ultimately resigned from USI, but had been placed on a PIP before leaving.  (Id. at 28.)

## XI.   Ibbison Files Charges Against USI

Ibbison filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) and with the U.S. Equal Employment Opportunity Commission (EEOC) on or around June 16, 2011.  On or around March 28, 2012, the EEOC issued a Notice of Right to Sue.  On or around April 2, 2012, the CHRO issued a Release of Jurisdiction.  On April 11, 2012, Ibbison filed this lawsuit against USI.

## Analysis

### I.   Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether there is a genuine dispute of material fact, "[a]ll reasonable inferences must be construed in the nonmoving party's favor." *Hill v. Curcione*, 657 F.3d 116, 124 (2d Cir. 2011).  Initially the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once a properly supported motion has been made, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  The Second Circuit has cautioned that, "in the context of a claim of sexual harassment, where state of mind and intent are at issue, . . . '[s]ummary judgment should be used "sparingly.""" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998)).

### II.   Hostile Work Environment Claims (Counts 1 and 3)[7]

Title VII prohibits "discharge . . . [or] discriminat[ion] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," among other things, "such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  "Title VII does not set forth a general civility code for the American workplace." *Kaytor*, 609 F.3d at 546 (internal quotation marks omitted).  However, Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

---

[7] The analysis of hostile work environment claims under CFEPA is the same as under Title VII, so the court treats Ibbison's Title VII and state-law hostile work environment claims together here. *See Kaytor*, 609 F.3d at 556; *see also Payne v. PSC Indus. Outsourcing, Ltd. P'ship*, Civil Action No. 3:13-CV-00355 (VLB), 2015 WL 5797004, at *10 (D. Conn. Sept. 30, 2015) ("A hostile work environment claim under CFEPA is examined under the same standards as those governing a hostile work environment claim under Title VII.").

The court examines all of the circumstances to determine whether a work environment is hostile or abusive. *Kaytor*, 609 F.3d at 547. The circumstances may include:

> the *frequency* of the discriminatory conduct; its *severity*; whether it is *physically threatening* or *humiliating*, or a mere offensive utterance; and whether it *unreasonably interferes with an employee's work performance*. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, *no single factor is required*.

*Id.* (emphasis by the *Kaytor* court) (quoting *Harris*, 510 U.S. at 23). Both an objective and a subjective standard must be met to prove the existence of a hostile work environment:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* (quoting *Harris*, 510 U.S. at 21–22.) While the standard for establishing a hostile work environment is high, the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks omitted; alteration and emphasis in original).

### A.  Whether USI was an Objectively Hostile or Abusive Workplace

USI argues that Ibbison cannot establish that USI was an objectively hostile or abusive workplace. According to USI, the only offensive conduct that Ibbison faced occurred episodically between late May 2010 and early August 2010, consisting of Dailey: making some sexual comments, touching her leg, attempting to kiss her twice, and sending her emails declaring his love for her. (Doc. 55-1 at 18.) Ibbison maintains that there is at least a genuine dispute of material fact as to whether she was the subject of repeated sexual advances from Dailey. (Doc. 64 at 8.)

Examining all of the circumstances, the court concludes that Ibbison has not presented sufficient facts to create a triable issue as to whether a reasonable person would have found the environment in which Ibbison was working to be hostile or abusive. Several of the events that

13

Ibbison highlights—such as the personal emails and the June 2010 attempt to kiss her—occurred outside the workplace. *See Harris*, 510 U.S. at 21 (focusing on conditions in the "workplace"). Even in the light most favorable to Ibbison, Dailey's conduct at the workplace was episodic and not particularly severe. Ibbison did not state that Dailey's conduct interfered with her work performance or affected her psychological well-being. Neither did she describe any of Dailey's conduct as physically threatening or humiliating.[8]

This case is similar to *McKenna v. VCS Group LLC*, No. 3:08CV1563(VLB), 2009 WL 3193879 (D. Conn. Sept. 30, 2009). In *McKenna*, the court found that a series of approximately 15 comments (relating to the plaintiff's marital status, breast size, and cleavage) made to the plaintiff by her female supervisor over a seven-month period were not sufficiently severe or pervasive to alter the plaintiff's working conditions for the worse. *Id.* at *5. The court described the comments as "at most episodic" and merely "distasteful" or "offensive." *Id.* at *6. The same is true with respect to the workplace conduct Ibbison highlights in this case.

*Mormol v. Costco Wholesale Corp.*, 364 F.3d 54 (2d Cir. 2004), is also similar. In *Mormol*, the plaintiff's male supervisor made a few statements to her over the course of about one month requesting sex. The Second Circuit concluded that the conduct was neither pervasive nor sufficiently severe to overcome its lack of pervasiveness. *Id.* at 59. Unlike in *McKenna* and *Mormol*, Dailey did engage in some potentially offensive touching, but it was episodic and he stopped when Ibbison asked him to. *See Bynog v. SL Green Realty Corp.*, No. 05 Civ. 0305 WHP, 2007 WL 831740, at *7 (S.D.N.Y. Mar. 20, 2007) (conduct included inappropriate touching of female employee's legs, but only "isolated incidents" that were—while "repugnant"—insufficient to sustain a hostile work environment claim).

### B.   Whether There is a Basis to Impute Dailey's Conduct to USI

Even if the workplace was objectively hostile or abusive, Ibbison has not shown a basis to impute Dailey's conduct to USI. An employer is only liable under Title VII if "there is a basis for imputing the conduct that created the hostile environment to the employer." *Kaytor*, 609 F.3d at 546; *see also Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (noting that employer's liability for harassment may depend on the status of the harasser). One basis for imputing the conduct to the employer is where the alleged harasser is the plaintiff's supervisor.

---

[8] Ibbison did not describe as threatening the October incident when Dailey came to her house drunk and banged on her door, nor did that event occur at the workplace.

*See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) ("When . . . the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer."); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 152–53 (2d Cir. 1997) ("[W]hen a supervisor wields the authority delegated to him by an employer either (a) to condition tangible job benefits affecting an employee on the employee's acceptance or rejection of the supervisor's sexual demands, or (b) to further the creation of a discriminatorily abusive work environment, the supervisor's conduct is deemed to be that of the employer, and the employer is liable for that conduct."). Here, Ibbison does not argue—and no facts suggest—that Dailey was her supervisor, so Dailey's conduct cannot deemed to be that of USI.

Even if the harasser is a coworker and not a supervisor, the employer can still be liable if it "knows or should have known of the conduct" but fails to take "immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d); *see also Vance*, 133 S. Ct. at 2439 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) ("When the source of the alleged harassment is a co-worker, the plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." (internal quotation marks omitted)).

Ibbison does not contend that USI lacked any reasonable avenue for complaint. Instead, she contends that USI had actual or constructive knowledge of the harassment but failed to take appropriate action. USI maintains that it had no actual or constructive knowledge of Dailey's conduct because, according to USI, Ibbison's statement to Pultio about being "uncomfortable" with Dailey lacked sufficient detail to constitute a "report" of sexual harassment. (*See* Doc. 55-1 at 22.) USI also contends that Pulito's response was appropriate and resolved the situation. (*Id.* at 23.)

### 1.   Actual or Constructive Knowledge

At her one-on-one meeting with Pulito in July or early August, Pulito remarked that Dailey had been coming to the Connecticut office for "non-business" reasons. Ibbison understood Pulito to mean that he saw that Dailey had "romantic sexual . . . or other intentions" toward her. (Doc. 63-1 at 51.) Ibbison then informed Pulito that Dailey was making her "uncomfortable" and "harassing" her, and that she no longer wanted to work with Dailey. (*Id.*

at 50.)  Here, there was no basis for Pulito to conclude that Ibbison was reporting *sexual* harassment.  Ibbison is entitled to all reasonable inferences on summary judgment, but none of the statements she made to Pulito—individually or in combination—would have put Pulito on notice of any sexual harassment.  Ibbison's own understanding of what she thought Pulito meant when he remarked about Dailey's "non-business" reasons is not determinative.

Courts have reached the same conclusion in similar circumstances.[9]  *Wood v. Sempra Energy Trading Corp.*, No. 3:03 CV 986 JCH, 2005 WL 3416126 (D. Conn. Dec. 12, 2005), involved a June 2001 incident where a derivatives trader, Howley, refused to discuss a certain deal with the plaintiff, Wood, and, when Wood blocked Howley's view of his computer screen and insisted that they discuss it immediately, Howley took Wood by the wrist and moved her arms out of the way.  Wood immediately complained about the incident to her superiors and, after an investigation, Howley was reprimanded and advised that his physical contact with Wood was inappropriate, and Wood was also counseled for her actions and for interfering with Howley's time-sensitive work.  In March 2002, Wood was terminated.  After a bench trial, the court concluded that Wood had failed to prove that she was engaged in any protected activity because, although she did complain about the incident, she had not mentioned either her gender or her sexual orientation, and did not allege that Howley's action was motivated in any way be her sex or sexual orientation.  *See id.* at *7.  Nothing about the substance of Wood's complaint suggested that it was anything other than a business dispute.  Ibbison's complaint to Pulito similarly lacked any statement that the issue with Dailey was sexual.

*Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276 (2d Cir. 1998), is similar.  The plaintiff in that case, Marilyn Galdieri-Ambrosini, worked as a secretary for Cliff Simon, the director of National Realty & Development Corporation's retail leasing department.  She complained to Simon or the office manager that she was overworked because other female workers were "slackers."  *Id.* at 292.  She also complained to Simon or the office manager that Simon was inappropriately having her work on his personal matters, such as calling his dry cleaner or handling matters related to the purchase of his house.  She was terminated after making those complaints.  Reviewing Ambrosini's retaliation claim, the court found that her

---

[9] The cases discussed immediately below involve retaliation claims, but their conclusions are illustrative with respect to the knowledge element of Ibbison's hostile-work-environment claim.

complaints "in no way intimated that she believed Simon's conduct to be influenced by her gender." *Id.* Ibbison's case is the same for the reasons stated above.

USI finds further support in *Farzan v. Wells Fargo Bank, N.A.*, No. 12 Civ. 1217(RJS)(JLC), 2013 WL 6231615 (S.D.N.Y. Dec. 2, 2013), *adopted*, S.D.N.Y. Mar. 21, 2014, *aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015). Farzan is an Iranian-American Muslim in his sixties who was hired by staffing firm Genesis 10 to work at Wells Fargo Bank. Under Wells Fargo policy, Farzan was classified as a "contingent worker," and was limited to an 18-month appointment unless a supervisor approved a longer term based on a "justifiable business need," or unless Wells Fargo granted an application for "conversion" into permanent employee status. *Id.* at *2. According to Farzan, after a manager told him that he would not be kept on at Wells Fargo beyond December 2011, he responded that he would file a "discrimination complaint" if he was not converted to direct employment. *Id.* at *5. Farzan did not allude to any protected characteristic as playing a role in Wells Fargo's decisions; his sole contention was that the contingent worker policy did not apply to him. Granting summary judgment against Farzan on his retaliation claim, the court stated that "no reasonable juror could conclude from the record that Wells Fargo knew, or reasonably could have known, that Farzan's complaints constituted opposition to conduct prohibited by discrimination laws." *Id.* at *28.

Like Farzan's complaint, Ibbison's complaint to Pulito simply did not put Pulito on notice about any sexual harassment. Other cases support the same conclusion. *See St. Jean v. United Parcel Serv. Gen. Serv. Co.*, No. 09-CV-3782(DLI)(LB), 2012 WL 71843, at *11 (E.D.N.Y. Jan. 10, 2012), *aff'd*, 509 F. App'x 90 (2d Cir. 2013) (employee's complaints that his supervisors were "harassing him," and that he was being "singled out" and treated "unfairly" did not "create[] an inference that the behavior was based on race"); *Billingslea v. Ford Motor Co.*, No. 06-CV-0556, 2010 WL 4861500, at *10 (W.D.N.Y. Nov. 30, 2010) (granting summary judgment for defendant where female African American complained about a supervisor assigning her extra work, but never mentioned race or gender discrimination); *Rommage v. MTA Long Island R.R.*, No. 08-cv-836 (DLI)(ALC), 2010 WL 4038754, at *14 (E.D.N.Y. Sept. 30, 2010) (granting summary judgment for defendant where complaint filed by African-American woman about the statements of a male Caucasian superior contained no reference to race or gender and stated only that superior lacked professionalism and caused humiliation).

2.    **Reasonableness of USI's Response**

"An employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it." *Distasio*, 157 F.3d at 65. "Whether the company's response was reasonable has to be assessed from the totality of the circumstances." *Id.* "Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.* Ibbison asserts that the reasonableness of USI's response is the "central factual dispute in this case." (Doc. 64 at 11.)

Here, the harm inflicted upon Ibbison was not severe—Dailey's emails, statements, and his attempts to kiss Ibbison and touch her leg were offensive to Ibbison, but did not rise to the level of threating or humiliating. Pulito acted to separate Ibbison and Dailey, telling Ibbison that she did not have to work with Dailey anymore. Ibbison testified that she was satisfied with that response. (Doc. 63-1 at 52.) Since there was no basis for Pulito to conclude that Ibbison was reporting sexual harassment, Pulito cannot be faulted for failing to begin an investigation into sexual harassment under USI's policies. Ibbison does contend that Pulito's response was satisfactory only until later events in December 2010; the court addresses that issue below.

III.    **Gender-Discrimination Claims Under Title VII and CFEPA (Counts 1 and 3)[10]**

USI argues that Ibbison's gender-discrimination claims should be dismissed because she cannot establish discrimination under the *McDonnell Douglas* burden-shifting framework. Title VII discrimination claims are evaluated using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73–74 (2d Cir. 2015); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ("In a Title VII sex discrimination case such as this, where there is no direct or overt evidence of discriminatory conduct, we apply the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green* . . . to determine whether summary judgment is appropriate."). Under that framework, "the plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise

---

[10] The analysis of discrimination claims under CFEPA is the same as under Title VII, so the court treats Ibbison's Title VII and state-law discrimination claims together here. *See Kaytor*, 609 F.3d at 556.

to an inference of discrimination." *Weinstock*, 224 F.3d at 42. If plaintiff succeeds in presenting such a prima facie case, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* "For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.*

USI argues that Ibbison cannot establish a prima facie case of discrimination because she cannot prove that the circumstances give rise to any inference of discrimination.[11] Specifically, USI contends that: "(1) the record is devoid of evidence suggesting Ibbison's termination was in any way discriminatory, and (2) Ibbison cannot point to similarly-situated employees who received favorable treatment." (Doc. 55-1 at 25.) Ibbison maintains that there is a triable issue as to whether she "received disparate adverse treatment in relation to similarly situated producers of USI performing at or below her level in 2010." (Doc. 64 at 15.) According to Ibbison, an inference of discrimination can be drawn from Dailey's presentation of his business plan to the Connecticut office combined with "the facts that Ibbison was treated so dissimilarly than Lavoie, that USI detoured from its own business model in suddenly and abruptly firing Ibbison rather than placing her in [the PIP], and that USI cannot identify a single other producer ever terminated without first going through [the PIP]." (*Id.* at 16.) USI maintains that any claim based on disparate treatment because of Ibbison's complaints of sexual harassment is really a *retaliation* claim, and that any remaining *discrimination* claim fails because Ibbison has not identified any similarly situated employees who received more favorable treatment. (Doc. 67 at 6 & n.4.)

In her discrimination claim, Ibbison is arguing that she was treated unfavorably (terminated) on the basis of her sex. (*See* Doc. 64 at 15.) As the Second Circuit has explained, "mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). The court discussed Ibbison's hostile work

---

[11] USI does not dispute that Ibbison is a member of a protected class or that she suffered an adverse employment action. USI asserts in a footnote that Ibbison was not qualified for her position "for the reasons stated with respect to [USI's] legitimate reasons for terminating her." (Doc. 55-1 at 25 n.10.) The court addresses issues related to Ibbison's job performance below.

environment claim above; the distinct issue in Ibbison's discrimination claim is whether she was *terminated* because of her sex.

To prove that claim, Ibbison need not identify a similarly situated male employee whom USI treated more favorably than her.[12]  *See id.* at 253 ("[T]hough it is helpful in proving sex discrimination, we have held that it is not strictly necessary for a plaintiff to identify an employee who was treated more favorably than the plaintiff and who was similarly situated to the plaintiff, except for being of the opposite sex."). "[W]hat matters in the end is not how the employer treated *other* employees, if any, of a different sex, but how the employer *would have* treated *the plaintiff* had she been of a different sex." *Id.* at 253–54.

In support of her argument that she was terminated under circumstances giving rise to an inference of discrimination, Ibbison asserts that "[t]he only differentiating factors between Ibbison and [similarly situated] producers [performing at or below her level in 2010] are that Ibbison reported to USI that she was being sexually harassed by Dailey." (Doc. 64 at 15.)  That assertion says nothing about whether USI would have terminated Ibbison if she had been of a different sex. Ibbison's assertion is that she was terminated because she had reported being harassed. That is a retaliation claim, and the court addresses it separately below. But assuming that Ibbison was terminated for her report to Pulito, there is nothing in the record to suggest that USI would have *retained* a similarly situated male employee who made a similar report of harassment.

## IV.   Retaliation Claims Under Title VII and CFEPA (Counts 2 and 4)[13]

Like gender-discrimination claims, retaliation claims are examined using the *McDonnell Douglas* burden-shifting framework. *Ya-Chen Chen*, 805 F.3d at 70. "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she 'participated in a protected activity,' 'suffered an adverse employment action,' and 'that there was a causal connection between her engaging in the protected activity and the

---

[12] As USI points out, Ibbison has not done so: Cianfaglione, a male, was not similarly situated because of his significant prior experience. To the extent that Lavoie was treated more favorably than Ibbison, that does not show discrimination "because of" sex, since Lavoie is also a woman.

[13] The analysis of retaliation claims under CFEPA is the same as under Title VII, so the court treats Ibbison's Title VII and state-law retaliation claims together here. *See Kaytor*, 609 F.3d at 556.

adverse employment action.'" *Id.* (quoting *Gorzynski*, 596 F.3d at 110). "This showing creates a 'presumption of retaliation,' which the defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" *Id.* (alteration in original) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). If the defendant provides such an explanation, then the presumption of retaliation dissipates "and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)).

### A.     Prima Facie Retaliation

USI does not dispute that Ibbison suffered an adverse employment action when she was terminated. USI does argue, however, that Ibbison cannot prove that she engaged in a protected activity. For the reasons discussed above, the court agrees. Reporting sexual harassment is indisputably a protected activity. *See Antonopoulos v. Zitnay*, 360 F. Supp. 2d 420, 428 (D. Conn. 2005). But Ibbison's report to Pulito was not a report of sexual harassment; none of the statements she made to him—individually or in combination—would have put him on notice of any sexual harassment. *See Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (complaints "centered on general allegations of harassment unrelated to race" were "not protected activity under Title VII"), *aff'd*, 629 F.3d 276 (2d Cir. 2010).

Even if that were not the case, Ibbison's prima facie case also fails because she cannot prove that there was a causal connection between any protected activity and her termination. As the Second Circuit has held, proof of causation can be shown in two ways: "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).[14] "[W]hile some courts have

---

[14] *Gorman-Bakos* was a First Amendment retaliation case. USI asserts that First Amendment retaliation cases are not sufficient in the Title VII context. (Doc. 67 at 11 n.11.)

held that three months is too long to draw a causal inference based on the temporal relationship, others have held that fact finders could draw temporal inferences from gaps between protected action and adverse employment actions of three months or, indeed, much longer." *McCall v. Genpak, LLC*, No. 13-CV-1947 (KMK), 2015 WL 5730352, at *22 (S.D.N.Y. Sept. 30, 2015) (citing cases). Ibbison's burden of establishing a prima facie case of retaliation is not heavy; she need only present a "minimal" amount of evidence at the summary judgment stage. *Kaytor*, 609 F.3d at 552; *see also Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 316 (2d Cir. 1999) (plaintiff's burden is "*de minimis*").

Here, approximately five months elapsed between Ibbison's report to Pulito in July or early August 2010 and her termination in mid-December 2010. That length of time strongly attenuates any causal relationship between those two events. Ibbison's "other circumstantial evidence" similarly falls short. She contends that she was terminated because Pulito had assured her that she would not have to work with Dailey, but then "needed" to terminate her "in order to facilitate Dailey's efforts to develop a joint health insurance fund for municipal employers *through USI's Connecticut office*." (Doc. 64 at 12; *see also id.* at 20.) According to Ibbison, a juror could infer that USI terminated Ibbison "to avoid altogether any issues that might arise as a result of Dailey regularly visiting USI's Connecticut office" as he pursued his business plan. (*Id.* at 23.)

Ibbison has presented evidence that she complained to Pulito about Dailey's "harassment," and that Pulito had assured her that she would not have to work with Dailey. She has also presented evidence that she was terminated shortly after Dailey pitched to USI a plan that might have brought him more frequently to USI's Connecticut office. The court concludes that, to the extent that might constitute "other circumstantial evidence" of causation, it is not sufficient to support Ibbison's prima facie case. Ibbison has presented no evidence that Dailey's plan would have required him to work with Ibbison in person. At most, Dailey's plan might have increased the frequency of his trips to the Connecticut office, but Ibbison never asked Pulito to stop all contact between her and Dailey or to limit Dailey's access to the Connecticut office. Nothing that Ibbison told Pulito could have put him on notice that such measures might be necessary.

---

*Littlejohn*, however, was a Title VII case, so it appears that there is no bright line in either context.

**B.      Legitimate, Non-Discriminatory Reason**

Even if Ibbison could articulate a prima facie case, the court concludes that USI has articulated a legitimate, non-discriminatory reason for terminating her.  USI has presented evidence that, by October, Pulito had expressed concern to Ibbison about her low number of appointments and final presentations.  Although Ibbison disputes that Pulito's December 14, 2010 email to Klecha was an "authentic and contemporaneous criticism of work performance," (Doc. 63 at 32), a reasonable juror could credit the email and conclude that Ibbison was terminated for poor work performance.

**C.      But-For Cause of Termination**

Finally, the court concludes that Ibbison cannot prove that USI's desire to retaliate was the but-for cause of her termination.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

There are some disputes about precisely how much business Ibbison had in her pipeline and when.  Those disputes are not material in light of the undisputed facts that in October Pulito explicitly expressed concern about Ibbison's low number of appointments and final presentations, and that Ibbison closed only one $10,000 sale in the six months of her employment with USI.  Pulito's November 18, 2010 email praising Ibbison was not materially related to Ibbison's ability to produce sales.  The fact that USI terminated Ibbison without putting her on a PIP is also insufficient to undermine USI's reasons for terminating her.

## Conclusion

For the reasons discussed above, USI's Motion for Summary Judgment (Doc. 55) is GRANTED.

Dated this ⟨2⟩ day of March, 2016.

/s/ Geoffrey W. Crawford, USDJ

Geoffrey W. Crawford, Judge
United States District Court